THE STATE v. JOHN JANES, Appellant.—1 S. W. (2d) 137.

Division Two, December 12, 1927.

*Von Mayes* and *Sharon J. Pate* for appellant.

*North T. Gentry,* Attorney-General, and *Claud Curtis,* Special Assistant Attorney-General, for respondent.

HENWOOD, C.—By an information filed in the Circuit Court of Pemiscot County, appellant was charged with the unlawful transportation of intoxicating liquors in a mortgaged automobile without the written consent of the legal owner of the mortgage. At the trial the jury found him guilty and assessed his punishment at imprisonment in the penitentiary for a term of four years. He was sentenced accordingly and appealed.

The evidence offered by the State showed that at the time in question Scott Carey lived in the loop of the old and new levees, about 150 yards west of the Mississippi River and about one mile north of the corporate limits of Caruthersville, Missouri, in Pemiscot County, and that he was deputy constable of that township. In his testimony for the State, Carey said that on or about the date charged in the information (April 8, 1925) he saw appellant driving a Buick roadster over the levee crossing about 300 yards south of his place and that appellant continued to drive the car about eighty or ninety yards towards his place, where it was stopped. "There was a boy by the name of Smith" in the car driven by appellant. Immediately behind the Buick roadster, a Ford coupe came over the levee and drove up to the east side of the Buick and stopped. Carey observed the occupants of these two cars moving back and forth between the same, apparently carrying something, and concluded to investigate the matter. Upon reaching the point where the cars stopped he found a third man there whom he recognized as Ray Edwards. Carey's own story as to what happened is as follows:

"Well, I was making garden out north of the house and two cars had just come through my place, and I heard another car crossing at the levee; I looked down and saw a big roadster come over and cross the levee and stop just outside of my gate and immediately behind it; there was a Ford coupe come over the levee and it drove up on the east side of the Buick and stopped. I saw some fellows going back from one car to the other and it looked to me like they were carrying something; I decided I would go down and see what they were doing and who they were.

"I got in my car and drove down there and I could see them, back and forth, carrying something, from one car to the other, and when I drove down and stopped, they had closed the cars down and locked them. I said, 'What are you fellows doing here?'. Nobody answered

me at all. Edwards had three locks on his car, he was closing the last one then, and I told him to open his car, I wanted to look in it and he said I couldn't do it without a search warrant, I asked him 'why?' and he said, 'The law was I had to have a search warrant to search a man's car.' I told him I didn't have to have any search warrant to arrest him, and I arrested all three and put them in the Buick and brought them to town and got a search warrant and opened the cars."

After the search warrant was procured, appellant gave the officers his keys, and two five-gallon cans of alcohol and about two gallons and a half of whiskey were found in the Buick roadster.

On cross-examination, this witness was further interrogated as follows:

"Q. At the time you saw the cars moving before they stopped, you don't know whether both cars had whiskey in them or whether only one had whiskey in it? A. Sure, I don't.

"Q. Do you know whether either car at the time you saw them in motion had intoxicating liquor in them? A. Bound to have, no where else to have got it.

"Q. I am asking if you know? A. Yes, I know.

"Q. How do you know? A. I know they didn't put it in there after they stopped.

"Q. Were you looking at them? A. Yes, I was looking at the whole transaction from the time they came over the levee.

"Q. Did you look at them continuously when you first saw them or look off? A. I wasn't watching them all the time, but wasn't but a few minutes after they stopped until I went down there; I do say I had my eyes on them from the time they stopped until I got there."

The sheriff of the county (J. H. Smith) testified that he assisted in the search, and that two five-gallon cans of alcohol and two and a half gallons of whiskey were found in the "back part" of the Buick roadster, after he unlocked and raised the cover over this part of the car. The following is taken from the sheriff's testimony as to his conversation with appellant:

"Q. Did you hear him make any statement on that day with reference to this liquor being in his car? A. Well, he wanted to call his bondsmen and I told him to wait, we were getting a search warrant and I told him if there wasn't any whiskey in there he wouldn't need no bondsmen.

"Q. Then what did he say? A. Well, I don't——he said go ahead and call them, I believe; I don't know whether he answered me."

J. S. Wahl was produced as a witness by the State and said he held a mortgage on the Buick roadster and that appellant still owed

him $800 and accrued interest on the debt which the mortgage was given to secure. He further said that he had not given appellant his written consent or his consent in any form to transport intoxicating liquor in the car.

At the close of the State's case, the appellant offered a demurrer to the evidence, which was overruled. Being content to stand on his demurrer, he offered no evidence in his own behalf.

I. The only serious question presented on the record before us is the sufficiency of the evidence. Learned counsel for appellant earnestly contend that there is no substantial evidence to support the finding of the jury on the main issue of transportation. After a very careful consideration of all of the facts and circumstances developed at the trial, we find ourselves unable to agree with counsel in this contention.

It was clearly established by the proof made that ten gallons of alcohol and 2½ gallons of whiskey were in the Buick roadster at the time of the arrest. Appellant had driven the Buick across the levee on some kind of a mission just a few minutes before his arrest. While the presumption of the continued existence of a proven fact does not run backward, yet, the surrounding circumstances may be such as to justify the inference that an established fact must have existed at a certain time in the immediate past. [22 C. J. 92.] There is no *positive* or *conclusive* evidence that the alcohol and whiskey were put in the Buick after it stopped near Carey's gate. If not put in the Buick after it stopped there, it must have been on board when the Buick crossed the levee. True, Carey testified, "I saw some fellows going back from one car to the other and it looked to me like they were carrying something," but it by no means follows, from this observation, that the Buick took on all or any particular part of its load of liquor after it stopped. Taken as a whole, Carey's testimony shows that he did not *know* what the men were carrying from one car to the other or from which of the two cars the articles, if any, were being moved. In any view of the case, it was a fair inference that the Buick and Ford met across the levee by appointment and that the occupants of both cars were connected with the handling of the liquor found in both cars. Moreover, there was evidence tending to show that both cars were equipped for hauling liquors under locks and keys and that the men found in charge of both cars were somewhat experienced in the liquor business. The driver of the Ford, apparently speaking for his companions in the Buick as well as for himself, asserted the constitutional rights of all in denying the deputy constable's request to search the cars without a search warrant. And the driver of the Buick (appellant) began his arrangements for bondsmen before the search was made, and this, notwithstanding the

sheriff told him he would need no bondsmen if no liquor was found in his car. Another outstanding circumstance to be noted is that the whole situation was left without any sort of explanation from appellant's side of the case. And we say this without any disposition to encroach upon the constitutional guaranty against self-incrimination or the statutory restrictions against any reference by counsel to the failure of the accused to testify in his own behalf and against the consideration of that fact by the court or jury. These safe-guards are limited to their express terms. [State v. Larkin, 250 Mo. 1. c. 234, 157 S. W. 1. c. 604.] This court has held that a prosecutor may properly argue to a jury that certain facts shown by the State's evidence are not disputed by any witness in the case. [State v. Hughes, 258 Mo. 1. c. 271, 167 S. W. 1. c. 531; State v. Ruck, 194 Mo. 1. c. 440, 92 S. W. 1. c. 713.] See also, in this connection, State v. English, 308 Mo. 1. c. 704, 274 S. W. 1. c. 472. If it is proper argument to a jury that no evidence has been offered in refutation or explanation of incriminating facts, then the jury in this case and this court may consider appellant's failure to offer any contradictory or explanatory proof in this case; not his failure to take the witness stand himself, but his failure, by the testimony of others, to offer any evidence in contradiction or in explanation of the liquor found in his car immediately following his fatal trip across the levee; or, if such other witnesses were not availble for this purpose, then some explanation to that effect.

Under all of the facts and circumstances shown, we think it was for the jury to say whether any of the liquor found in the Buick was in it when appellant drove it across the levee on the day in question, and that the trial court properly overruled the demurrer to the evidence. [State v. Bishop, 296 S. W. 147; State v. Milstead, 285 S. W. 429.]

II. Further complaint is made of improper remarks made by the prosecutor in his argument to the jury. The motion for new trial fails to specify the remarks complained of, and, for that reason, this matter is not properly presented for our review. [Laws 1925, p. 198; State v. Standifer, 289 S. W. 856.]

III. It is also urged that the punishment in this case is excessive and unreasonable and that the verdict is the result of passion and malice on the part of the jury. Considering the gravity of the charge, as viewed by the framers of the Prohibition Act, the maximum punishment prescribed by the act for this offense, and the evidence adduced, we find no substantial basis for this contention.

IV. Other assignments of error included in the motion for a new trial are not considered in appellant's brief, and will, therefore, be

treated as abandoned. [State v. Bishop, 296 S. W. 147; State v. Kelley, 284 S. W. 801.]

In accordance with our conclusions, stated above, the judgment is affirmed. *Higbee* and *Davis, CC.,* concur.

PER CURIAM:—The foregoing opinion by HENWOOD, C., is adopted as the opinion of the court. All of the judges concur.