227 S.W.2d 752 (1950)
BOLOMEY et al.
v.
HOUCHINS et al.
No. 27705.
St. Louis Court of Appeals. Missouri.
February 21, 1950.
Rehearing Denied March 24, 1950.
*753 Arnold J. Murphy, Jr., Louisiana, and James D. Clemens, Bowling Green, for appellants.
F. D. Wilkins, Louisiana, and Rendlen, White & Rendlen, Hannibal, for respondents.
BENNICK, Commissioner.
This is a suit to determine the location of an easement or roadway across defendants' land, and to enjoin defendants from interfering with plaintiffs' use of the roadway as so located.
There is no dispute about the existence of the easement, which was created by the will of one Rufus Henderson which was admitted to probate in the Probate Court of Pike County, Missouri, on September 10, 1892.
The lands of the respective parties lie some few miles west of the City of Louisiana. Defendants are the owners of a tract of 37 acres which lies immediately south of an old public road which connects with an improved farm-to-market road leading into Louisiana. Plaintiffs' landa tract of 40 acreslies immediately south of defendants' land; and as the two tracts are situated, plaintiffs' only means of access to the public road is across defendants' land.
Defendants' land slopes downward towards the north. A small watercourse known as Henderson Branch runs across the northeast corner of defendants' land in a generally north and south direction. The branch flows towards the north, and separates the main body of defendants' land from a small tract of 5.77 acres which lies to the north and east of the branch. The land on the west bank of the branch is high and impassable for any kind of vehicle. However the land along the east bank is level and suitable to be used for roadway purposes.
At the time of his death Rufus Henderson was the owner of all the land now owned by both plaintiffs and defendants; and in his will, by which he devised the entire 77 acres to his daughter, Louise, subject to a life estate in his wife, Sarah, he inserted a provision "reserving for my sons, John and Thomas, the right of way through said tract of land". The record does not reveal where John and Thomas were residing at the time of the execution of Rufus Henderson's will, though it is obvious that they were so situated that their only means of ingress and egress was across the 77-acre tract. In 1897 John and Thomas acquired the tract except for the northeast corner of 5.77 acres which had been previously sold by Louise to their brother-in-law, Ben Zumwalt; and in November of the same year they conveyed the north portion of the tract to Ben Zumwalt (less the 5.77 acres which he already owned), "reserving to said first parties the right of roadway through said tract". By subsequent conveyances defendants have become the owners of the north 37 acres through Ben Zumwalt, while plaintiffs have acquired the south 40 acres through the Hendersons.
Thus it is to be seen that Rufus Henderson created the easement without definitely fixing its location other than to refer to it as "the right of way through said tract of land". Furthermore the same generality appeared in the deed from John and Thomas to Ben Zumwalt; and the result has been to give rise to the present controversy. Undoubtedly Rufus Henderson intended to refer to a roadway as already established and in use at the time of the execution of his will, but the present owners of the land cannot entirely agree where it was that such roadway was located. It is conceded that the roadway enters defendants' land from the south at a point west of Henderson Branch, and then proceeds downhill to the north until it reaches the branch near the south end of the 5.77-acre field. The dispute is over the question of its course from that point on. According to defendants, its further course is wholly in the bed of the branch to the north end of their property, while under plaintiffs' theory the roadway crosses the branch and then continues northward over the level ground along the east bank of the branch at the edge of the 5.77-acre field.
*754 The reason for the controversy is that the bed of the branch is at best poorly adapted for use as a roadway for vehicles such as a modern farmer employs. It is rough at all times, and after heavy floods, which periodically occur in rainy seasons, it becomes filled with stones and boulders which must be removed in order for vehicles to travel over it. Furthermore in winter weather it fills with ice and slush so that it cannot be traversed by wheeled vehicles, and is frequently impassable even to one on horseback.
The witnesses consisted of the respective parties themselves, certain former owners of one or the other of the tracts of land, and other persons more or less familiar with the territory in question over a period of years.
All the witnesses were agreed that the bed of the branch was always subject to use as a roadway whenever its condition would permit. Likewise they were all agreed that there had always been more or less travel along the east bank of the branch, though they were not entirely in harmony as to whether there was a definitely marked roadway along that course. Plaintiffs' evidence tended generally to show that both ways had always been available and open to travel at the option of any one who desired to cross the 37-acre tract of land. Defendants' evidence, on the other hand, was to the general effect that the bank was never traveled by members of the public except when the bed of the stream became impassable, and then only by express permission of the owners of the land.
Generally speaking, plaintiffs' evidence tended to indicate that the two roads had been used interchangeably, one about as much as the other. According to some of the witnesses, the branch road had customarily been used when it was passable, but when it became impassable, travel was shifted to the bank road. Only one of plaintiffs' witnesses made any reference to the necessity of getting permission from the owner of the land to leave the stream and travel along the bank. The other witnesses had the idea that permission had never been required, and that the course to be taken had been left entirely to the choice of the traveler. For the most part plaintiffs' witnesses could not recall that the 5.77-acre tract had ever been fenced until shortly before the institution of this lawsuit, or that crops had ever been raised upon it.
According to defendants' evidence, the branch road was the original road, and whatever travel was had along the bank was only for the benefit of the owners of the land. In seasons when the branch road was impassable, members of the public, including plaintiffs' predecessors in title, would travel along the bank, but only by permission of the owner of the land. Marcey Henderson, a son of John and a grandson of Rufus, and the man from whom plaintiffs acquired their 40-acre tract, testified that when he owned such tract he never claimed any right to travel along the bank except by permission of the owner. Contrary to what plaintiffs' evidence had disclosed, defendants' witnesses testified that the 5.77-acre tract had originally been enclosed by a rail fence which extended up to and ran along the very edge of the branch, and that the field had been frequently in cultivation. It was in the winter season after the crops had been gathered that the branch would become impassable because of ice and slush. At other times any high water would subside in an hour or so. Defendants objected to the use of the bank for roadway purposes because it involved cutting up the field when the ground was soft and stirring up dust when it was dry. A wire fence shutting off the bank road was erected by defendants in February, 1948, and this suit followed shortly thereafter.
At the close of all the evidence the trial judge, acting at the request of the respective parties and accompanied by their representatives, went out to the vicinity in question and made a personal inspection of the premises.
In its findings of fact regarding the location of the roadway, the court found that from the point on defendants' south line where the roadway enters their land to the west of the Henderson Branch, the roadway meanders downhill some 200 yards to a point on the west bank of the branch; *755 that it crosses to the east side of the branch at that point by way of a crossing theretofore constructed by the parties and their predecessors in title; and that from such point on it runs along the east bank of the branch to the north line of defendants' property, where it emerges upon the public highway.
It is thus to be observed that upon the warmly contested issue of the location of the roadway, the court sustained plaintiffs' contention while disapproving the contention of defendants.
Concluding that Rufus Henderson, by his will, had intended to establish a roadway susceptible of travel at all times throughout the year and had not intended to fix the roadway in the bed of the branch except as it was necessary to cross the same, and further finding that defendants had interfered with plaintiffs' free use and enjoyment of the roadway, the court perpetually enjoined defendants and all who might claim under them from obstructing plaintiffs and all who might claim under them in the free use and enjoyment of the roadway as the court had found that it was to be located.
Unavailingly moving for a new trial, defendants gave notice of appeal, and by subsequent steps have caused the case to be transferred to this court for our review.
Defendants argue that the court erred in finding that Rufus Henderson, by his will, had reserved a roadway along the east bank of the branch in the 5.77-acre field; and in support of their contention they rely strongly upon what they denominate public acts of disclaimer in subsequent conveyances constituting links in the chain of title to the respective tracts. They insist that a fair regard for all the evidence should impel the conclusion that the branch road was the originally established way; that the space along the east bank in the 5.77-acre field was only used as a roadway in emergencies, and then by permission of the Zumwalts, defendants' predecessors in title; that in the passing years, as automobiles and modern farm machinery came into existence, the bank road unquestionably became more convenient; that defendants themselves laid the roadway along the east bank in the 5.77-acre field to serve their own purposes, and then permitted plaintiffs and others to use it as a matter of accommodation among neighbors; and that such permissive use thus extended to plaintiffs has been responsible for fathering the alleged erroneous idea on their part of use of the bank road as a matter of right.
Where (as in this case) an easement in land is created in general terms without giving its definite location and description, the course over which the right is to be exercised may be subsequently fixed by the express agreement of the parties, or a selection may be inferred within the boundaries of the land over which the right is granted by proof of the use of a particular way on the part of the grantee or owner of the dominant estate along with the acquiescence of the grantor or owner of the servient estate. Massa v. Union Electric Light & Power Co., Mo.App., 50 S.W.2d 714; Geismann v. Trish, 163 Mo. App. 308, 143 S.W. 876; Davis v. Watson, 89 Mo.App. 15; 28 C.J.S., Easements, § 82; 17 Am.Jur., Easements, sec. 86.
In case the parties cannot agree, a court of equity has jurisdiction to determine the location of the servitude, in which event it must proceed with proper regard for the rights of both the parties, taking into consideration the condition of the premises and the purpose which the easement was intended to serve, and bearing in mind that the grantee is entitled to a reasonably convenient and accessible way within the limits of the grant. 28 C.J.S., Easements, § 80a; 17 Am.Jur., Easements, sec. 86. Furthermore, if it appears that there was a way already located at the time of the grant, it will be assumed that the grantor had such way in mind, and the same will be held to be the way indefinitely referred to in the instrument. 28 C.J.S., Easements, § 80b.
The proper decision of the case is by no means without its difficulties.
It is to be borne in mind, as already pointed out, that Henderson Branch is the dividing line between the 5.77-acre tract and the remainder of the land, so that any *756 roadway along the east bank of the branch would necessarily lie wholly within such 5.77-acre tract.
Rufus Henderson, as we have shown, owned all 77 acres at the time of the execution of his will devising all 77 acres to his daughter, Louise, and reserving for his sons, John and Thomas, "the right of way through said tract of land". It was only a comparatively few months after Rufus Henderson's death that Louise conveyed the 5.77-acre tract to Ben Zumwalt without making reference to the easement existing in favor of her brothers, John and Thomas. This, defendants argue, constituted a public act of disclaimer of the existence of an easement in the 5.77-acre tract where plaintiffs are claiming that it was originally established.
It will be recalled that in 1897 John and Thomas acquired all the land except the 5.77-acre tract which was owned by Ben Zumwalt, and then in the latter part of the same year conveyed to Ben Zumwalt all of defendants' present land exclusive of the 5.77-acre tract, "reserving to said first parties the right of roadway through said tract". Defendants argue from this that since John and Thomas, not being the owners of the 5.77-acre tract, did not attempt to convey and could not have conveyed such tract by their deed, the reservation of a roadway in the land which they did convey could only have referred to land outside the 5.77-acre tract, and thus unmistakably indicated that they themselves, as the original dominant tenants, regarded the easement as having existed elsewhere than in the 5.77-acre tract.
Defendants' argument might be quite persuasive were it not for all the evidence regarding the optional use of either the bed of the branch or the east bank of the branch for roadway purposes in passing through what is now defendants' land.
There is of course no question of plaintiffs' right to use the bed of the branch whenever they so desire, and we are not concerned with how that right has been obtained. In other words, it is of no consequence that upon John's and Thomas' acquisition of the fee in what is now defendants' land exclusive of the 5.77 acres, any easement theretofore existing in their favor in such land would apparently have been extinguished by merger, which would mean that any subsequent easement in any part of such land would necessarily depend upon the reservation inserted in their own deed to Ben Zumwalt. 28 C.J.S., Easements, § 57.
The whole question is whether the east bank of the branch is now burdened with an easement in plaintiffs' favor, and it is enough to say that if such an easement was created by Rufus Henderson's will, it would make no difference upon the question of the subsequent existence of the easement that it was not referred to in Louise's deed to Ben Zumwalt. The law is that where an easement is annexed as an appurtenance to land by a reservation such as that contained in Rufus Henderson's will, it passes with a transfer of the land although not specifically mentioned in the instrument of transfer. 28 C.J.S., Easements, § 46.
The matter actually resolves itself into one of what was Rufus Henderson's intention at the time of the execution of his will.
The great weight of the evidence was to the effect that the east bank had always been used for travel, and especially so when the bed of the stream was impassable as it was on so many occasions throughout the year. It is true that motor vehicles and complex farm machinery were unknown in Rufus Henderson's day so that the bed of the branch was perhaps not then as poorly adapted for roadway purposes as it has since become. However there were always times when the bed of the branch was impassable and unusable even during the lifetime of Rufus Henderson. Surely in reserving a roadway for his two sons he intended to reserve a roadway that was susceptible of travel at all times throughout the year; and we must assume that in writing the reservation into his will, he had in mind the practice then existing of using the bed of the stream and the east bank interchangeably as circumstances might make expedient.
*757 We do not agree with the lower court that Rufus Henderson did not intend to establish an easement in the bed of the branch except as it was necessary to cross the same. Our own view is that the easement he intended to create was one including both the bed of the branch and its east bank at the option of the owner of the dominant estate. However the only question for our decision is whether plaintiffs are entitled to travel along the east bank as a matter of right, and since the lower court has held that such course is lawfully available to them, its ultimate result is undoubtedly correct.
It follows that the judgment rendered by the circuit court should be affirmed; and the Commissioner so recommends.
PER CURIAM.
The foregoing opinion of BENNICK, C., is adopted as the opinion of the court.
The judgment of the circuit court is, accordingly, affirmed.
ANDERSON, P. J., and HUGHES and McCULLEN, JJ., concur.
On Motion for Rehearing.
BENNICK, Commissioner.
Defendants-appellants have filed a motion for rehearing in which, while raising no objection in regard to our declaration of the law applicable to the issues in the case, they earnestly question whether certain of the statements of fact contained in our principal opinion are supported by the record.
They particularly complain that after concluding that the location of the easement resolved itself into a question of Rufus Henderson's intention at the time of the execution of his will, we then went on to say that according to the weight of the evidence the east bank had always been used for travel, and especially so when the bed of the stream was impassable; that there were always times when the bed of the stream was impassable during the lifetime of Rufus Henderson; and that we must therefore assume that in writing the reservation into his will, Rufus Henderson had had in mind the practice then existing of using the bed of the stream and the east bank interchangeably for roadway purposes as the circumstances might make expedient.
The will, which was admitted to probate in 1892, had been executed in 1888, and defendants insist that there was no showing, either expressly or by implication, that the bank was ever used as a roadway at that time.
Considering the fact that the will had been executed exactly sixty years before the trial of the case in the court below, it was naturally to be expected that but little direct testimony would be available regarding the location of the roadway at the time Rufus Henderson wrote the reservation. However defendants are wrong when they say that the record is utterly devoid of evidence of that character. Plaintiffs' witness, Martin Lafferty, was seventy-five years of age, and he had been acquainted with the neighborhood since he first attended Henderson School when he was six years of age, which would have been about 1879, or nine years before the will was executed. Asked how long he had known the road as it existed on the bank, he answered that "at that particular time", by which he obviously meant the time when he was attending Henderson School, both the branch and the bank were used for travel.
But even though it may be that Martin Lafferty was the only witness who was able to testify of his own personal knowledge regarding the location of the roadway during Rufus Henderson's lifetime, there was an abundance of evidence giving rise to the implication, and supporting the statement in our principal opinion, that during all such time the bed of the stream and the east bank had been used interchangeably as circumstances made expedient. Such evidence consisted of the testimony of plaintiffs' other witnesses regarding the location of the roadway at subsequent times with which they themselves were familiar.
We recognize the general rule that proof of the existence of a condition or state of facts at any given time will not *758 raise the presumption or give rise to the inference that the same condition or state of facts existed at a prior time. However the rule has its exceptions, and whether it is to be applied in a given instance depends largely on the facts and circumstances of the particular case. A typical example for an exception to the rule is the situation where the condition or state of facts at any given time would ordinarily not have existed except for its existence at a prior time, and in such a case the necessary inference may be indulged retrospectively from proof of the subsequent existence of the condition or state of facts. 31 C.J.S., Evidence, § 140a.
The testimony of plaintiffs' witnesses other than Martin Lafferty covered a period of from twenty-five to fifty years before the trial, and disclosed an open, visible, continuous, and unmolested use of the bank for roadway purposes through all that time in seasons and on occasions when the bed of the stream became impassable. It was of course nothing new for the branch to be subjected to heavy floods, or for it to become filled with ice and slush in winter weather. Those conditions had undoubtedly existed in Rufus Henderson's lifetime, and had no less served to make the bed of the stream impassable in those years than in the more recent years about which the witnesses testified. In other words, it had been just as necessary for the bank to be used for roadway purposes in Rufus Henderson's lifetime as it had been in the period of fifty years before the trial; and this circumstance, considered along with the evidence regarding the customary use of the bank for roadway purposes up until the time when this controversy arose, justified the inference that the bank had been used in like manner during Rufus Henderson's lifetime, and that it was such practice which he had had in mind in writing the reservation into his will.
The Commissioner recommends that appellants' motion for rehearing be overruled.
PER CURIAM.
The foregoing opinion of BENNICK, C., is adopted as the opinion of the court.
Appellants' motion for rehearing is, accordingly, overruled.
ANDERSON, P. J., and HUGHES and McCULLEN, JJ., concur.