GLOVER **v.** BRUCE.

No. 43608.

Supreme Court of Missouri.

Division No. 1.

March 8, 1954.

John Whitsitt, Kansas City, Claude L. Schenck, Kansas City, Mo., for appellant.

Harry A. Hall, Hammond C. Woods, Kansas City, Mo., Louis H. Plummer, Kansas City, Kan., for respondent.

DALTON, Judge.

Action to contest the will of Juretha Josephine Campbell, deceased, on the ground of undue influence and testamentary incapacity. Verdict and judgment were against the will and proponent has appealed.

The alleged will was executed on May 1, 1950 and testatrix named Mary Jane Bruce (proponent-appellant) as executrix and sole beneficiary "for services rendered by her to me during the last part of my life." Reference was made in the will to "certain policies of insurance on my life in which a granddaughter of mine is named as beneficiary." The will provided that "the proceeds of these policies will constitute all that I desire to leave to her." The record shows that the granddaughter, Betty Jane Glover (contestant-respondent), received, as the proceeds of these policies, about $800. It is admitted by the pleadings that, "for some time prior to" June 25, 1950, Mrs. Bruce had been the housekeeper for testatrix and proponent's answer alleged that during the last 17 years she had "nursed, tended and looked after the business of Juretha J. Campbell during her illnesses."

Testatrix died June 25, 1950. The death certificate shows her age as 54 years, however, contestant offered some evidence tending to show that she was 65 at the time of her death. The will was duly probated in the Probate Court of Jackson County on June 27, 1950, and this action was instituted on May 21, 1951.

Proponent's evidence tends to show that a few days prior to May 1, 1950, testatrix personally telephoned to J. T. Jennings, a practicing attorney in Kansas City who had represented her on several occasions over a period of two or three years, and told him she wanted to make a will. He knew and recognized her voice and went to her home. Mrs. Bruce admitted him and he found testatrix in bed. Testatrix told him she was in ill health and had been in the hospital, but that she wanted to make a will. "She talked in a perfectly sane manner." She told him "her granddaughter had brought a lawyer out to see her, to get her to convey the property to her, but she didn't do it." Mr. Jennings asked testatrix about the extent of her property and understood she owned only one piece of real estate. He understood also that her only relative was a granddaughter and he asked why she didn't want to give the property to her. She said that her granddaughter "had been cruel to her and she had asked her to leave." She further said she was leaving eight or nine hundred dollars in insurance policies to her granddaughter and "that was all she wanted her to have." She said Mrs. Bruce was a neighbor who had been kind to her and had helped her for a great many years.

Mr. Jennings subsequently prepared the will in his office and took it to testatrix' home and read it and explained it to her. She knew exactly what she was doing. When the provision of the will with reference to the insurance policies was read and the word "niece" appeared, she promptly told him the word should be "granddaughter" and requested the correction, which was made. She then asked Mrs. Bruce (who had stayed out of the room) to get some witnesses and Mrs. Bruce went out and came back with two. Testatrix signed the will in the presence of her attorney and the two witnesses, nobody helped her.

The two attesting witnesses lived across the street from testatrix. They had known her for more than six years. She told one of the witnesses "* *. * that her friend had been so good * * * for so many years * * * any time she was sick, she came and waited on her, and she said, 'I want to reimburse her in some way.' So

then she said she had been better than anybody else, and she didn't care for anybody else." She appeared sane. Witness noticed nothing unusual in her behavior during a 45-minute visit. According to one witness, testatrix got up out of bed and walked around and sat up while they were there, she seemed to be doing pretty well that evening, she seemed sane, held a very logical conversation with the witnesses. She knew what she was doing. She told the witnesses she had been quite ill, but that she was getting all right. She sat on the bed to sign the will. Mrs. Bruce was not in the room when the will was signed, she was in the hall. Both witnesses signed the will at the request of testatrix after it had been read aloud to her and she had said that it was the way she wanted it. One of the witnesses had talked to testatrix from the sidewalk and had seen her out on her porch after her return home from the hospital. Testatrix had replied in a very normal manner. Each of the two witnesses identified their signatures and identified the will which had been signed and witnessed.

Contestant's evidence is for the most part entirely uncontradicted. It tends to show that testatrix owned a residence located at 1326 Garfield Street in Kansas City, where she had lived and operated a rooming house for a number of years. It was a three-story house with a basement and she had eight or nine roomers. She left surviving her, as her sole and only heir at law, Betty Jane Glover, hereinafter referred to as Betty, age 24, the only daughter of testatrix' only son, who had been killed by accident when Betty was only nine months of age. In early life Betty had lived off and on with her grandmother and in 1946 had stayed at her grandmother's home while attending summer school, but she had since married and moved to New York City, where she resided with her husband and three small children. Testatrix often sent her clothes for the children and some money and she always smiled upon and talked about her granddaughter and her great grandchildren.

On February 15, 1950, testatrix suffered a "cerebral stroke." She was sent to General Hospital No. 2 in Kansas City. On admission to the hospital, she was "very disoriented" and "incoherent", could not give any accurate information about the onset of her illness. The hospital record of a physical examination on February 16, 1950, shows "Impressions: Hypertensive heart disease; possible cerebral vascular accident; epilepsy." Final diagnosis was "hypertension" (high blood pressure) and "encephalopathy" (a disease of the brain tissues) (neither would develop suddenly). Subsequent records show that she said she had been sick four months before; and that she complained of headaches, a stroke and constipation. Hospitalization continued until she became ambulatory. She was discharged April 10, 1950, and returned to her home.

Immediately after testatrix had been taken to the hospital on February 15th, one of her roomers had telephoned to Betty in New York. Betty and her children and her mother at once returned to Kansas City and Betty appeared at the hospital on February 17, 1950. Betty testified: "I found she was * * * very sick. * * * Her head was hurting. She had a pain in her head. Her head was aching. * * * She was glad to see me. * * * She said, Betty, thank God you are here. I prayed for you to come. * * * She said my aunt had the keys to the house and she wanted me to go and take care of it; for me and my mother, rather to manage it until she got home." She quoted testatrix as saying "* * * I want you to take over the house. I want you to be right there, and the children." Betty's aunt (Mrs. Wilder) testified that she visited testatrix in the hospital the second day after she was in the hospital and received the house keys from testatrix, who said: "When Betty comes here from New York, you give her the keys."

Betty continued to visit her grandmother very frequently at the hospital. She would take her clean nightgowns, comb her hair and "show her how her money was being spent." On one of these visits, on Feb-

ruary 23rd, she appeared with Louis H. Plummer, an attorney, and testatrix was asked to make a will. The attorney was not called by testatrix, but by Betty and her mother and they accompanied the attorney to the hospital. He testified: "I asked her (testatrix) if she had a granddaughter and if this was her granddaughter, and did she care to make a will, and she continued to say she didn't see why it was necessary to make a will. I asked her did she want her granddaughter to have her property and she said, 'Yes,' and I asked her was there any objection to her making a will in the future and she said she didn't see the necessity of making a will inasmuch as the granddaughter would get everything anyway. * * * She said she had the home, but that Betty would get it anyway. She didn't see why she needed to sign anything." Betty testified with reference to this visit and said: "Well, she had said that everything was to go to me, so we asked her to make a will, and her mind was upset with everything, she said, 'Well, Betty, everything goes to you anyway,' and so Mr. Plummer took the paper * * *" ( a piece of paper on which testatrix had been asked to sign her name). Thereafter, on the same day, Betty returned to the hospital and found Rev. Henry Smith (one of testatrix' roomers and a couple of people from next door) standing at her grandmother's bedside. Betty testified: "* * * She said to me, she said 'Betty, they say you are trying to take my property.' So I said 'I am trying to take your property, Grandmother?' And she said 'Yes.' So I just put the nightgown on the bed and left, * * * later that night I came back and I said, 'How could I take your property, Grandmother, when you are still living and everything you died with would go to me?'"

While in the hospital, testatrix sought to recover from Mrs. Della Smith some three insurance policies that had apparently been pledged for a loan eight or nine years before. She said to Mrs. Smith, "Smith, you have got the policies I willed. I want Betty to have those." Mrs. Smith did not give them to her in the hospital at that time, "because she (testatrix) kept on arguing the matter," but the second day, after testatrix had returned to her home from the hospital, she again asked Mrs. Smith "if she could have the policies," and Mrs. Smith gave them to her. She told Mrs. Smith, that "she was leaving Betty the insurance," and that "Betty won't get what she thinks she is going to get."

While in the hospital, testatrix told Betty she "wanted to come home and see what was going on." When she was brought home on April 10th, she walked in. "She (testatrix) walked in the back door and she looked around the downstairs, and she went to bed." While some of contestant's witnesses testified that testatrix remained in bed after her return from the hospital and did not get up and walk around, Betty's (contestant's) personal testimony tended to show that, after testatrix returned from the hospital, she would often go down to the basement or go upstairs and she would get up and down and would not stay in bed. There was testimony that testatrix was weak when she returned from the hospital, but that "she would get up and wander around the house * * * tried to do some little things * * * She always did things to try to keep her house * * * She complained of pain in her head * * * complained of headaches." She wasn't able to do the housework and Mrs. Bruce did some of it. However, all of the time up to her death, she looked after her own business, looked after her own rents and made her own collections. On this issue there was no evidence to the contrary, since proponent's evidence was to the same effect and shows that two days before testatrix went to the hospital the last time, she stood in her kitchen, got out her purse and paid a man a bill for some linoleum she had purchased. Contestant's witness Smith visited with testatrix very frequently after testatrix returned from the hospital, and until June 22nd. After May 1st, Mrs. Bruce was there all of the time. Other neighbors would also visit. Testatrix knew them, "She recognized every one of them." She visited with her friends and roomers each day.

After testatrix returned to her home on April 10, 1950, Betty's mother left in a couple of days and went to Leavenworth, where she was employed. Some ten days thereafter, testatrix told Betty, "Betty you will have to get the children out of here. I can't stand their noise * * * Just get the children out of here. * * * I will take care of you. I will give you money." Betty took the children and went to Leavenworth, but returned to see her grandmother about once each week. Testatrix told Mrs. Smith that "she had Betty go home because she couldn't stand the noise of the children."

On June 22, 1950, testatrix suffered another stroke and was returned to the hospital in an unconscious condition. She was "seemingly having epileptic seizures." Her condition did not improve and she died June 25, 1950.

The evidence particularly relied upon by contestant to show mental incapacity and undue influence was as follows: In December 1949, or January or February 1950, prior to testatrix' first visit to the hospital, Dr. D. M. Miller, a physician and surgeon, made a visit to testatrix' home, but didn't take the case nor treat her. He testified that she said she "was ill with her head, which was paining." When he questioned her, her answers "began to be irrational." Her mind was not clear. When he attempted to listen to her heart with a stethoscope, she moved to the side of the bed and said "she wasn't going to have any operation." He saw her ten to fifteen minutes. From his questions and her answers he diagnosed "her case * * * as a mental or psychopathic patient" and he recommended that she call a specialist. He further testified that a person having the type of disease testatrix seemed to have was not considered insane.

When Betty and her mother first returned from New York testatrix "didn't start acting funny at that time to us. She was just sick." "She always complained of her head." When testatrix returned to her home on April 10, 1950, she said she ached all over, and was glad to get home, but when Betty's mother gave her the insurance papers, her deed and abstract, "and the money that we got" from tenants and wanted to show her the things, * * * she said she wasn't interested in them, which was unusual. Mrs. Della Smith saw nothing unusual about testatrix in the hospital "except when she wanted the policies. I couldn't understand about that * * * she kept on arguing the matter."

On February 17, 1950, when Betty first saw her grandmother in the hospital she told her she had named her baby boy Joseph Danzy Glover for testatrix' son (Betty's father). "She (testatrix) thought it was so funny and she laughed about it. * * * She laughed because she couldn't understand why I named him that * * * she acted like she really didn't know what was going on." On February 17th, when Betty came back to the hospital and told her of collecting back rent from the roomers and asked what to do with it * * * she just did not say. She didn't care. * * * All the time I saw her she complained."

About a day after testatrix returned from the hospital in April, she asked Betty "to go out and get some things straightened out," but, when Betty returned, testatrix asked "Why did you leave me with all these kids? As if she was mad because I had left her with the children."

There was much evidence that testatrix had often said that Betty would get everything; that she never expressed any anger with Betty; that she smiled on her granddaughter and her greatgrandchildren and said nothing about Betty having let her down or not looking after her. Before, during, and after her first trip to the hospital, testatrix always said she wanted Betty to have everything. There was never any indication of any change of attitude toward Betty. In 1949 and in 1950, in the hospital and later, she talked of Betty all the time and always said there was no need for a will because she wanted Betty to have everything she had. In 1950 she said that Betty "will have to take care of herself and the children and the home would always be hers." The same view was expressed in 1945. In 1949 and 1950 testa-

trix complained to her beautician about being sick and she always "haggled" with her about the price.

When testatrix was re-admitted to the hospital on June 22, 1950, her condition was diagnosed "cerebral vascular accident" and reference was made to the fact that she had been previously hospitalized for "hypertensive heart disease." Her death certificate, dated June 26, 1950, showed: "Disease or condition directly leading to death—Gliora with Encephalomalacia" (meaning brain tumor or a growth in the tissues of the brain). Other significant conditions—Generalized arteriosclerosis" (hardening and narrowing of the blood vessels or arteries). (The definitions in parenthesis are from the oral testimony.) The pathologist's report of a post-mortem examination on June 25, 1950, showed "final diagnosis," as follows (all material in parenthesis is from the oral testimony): "1. Sickle cell anemia (a definite form of cell that is found in the anemic person, a red cell that looks like a sickle). 2. Generalized arteriosclerosis (the hardening and narrowing of the blood vessels or arteries). 3. Severe arterionephrosclerosis (hardening of the arteries of the kidneys). 4. Hypertension (clinical) (an increase in the blood pressure due to the hardening of the kidneys on age, abnormal blood pressure). 5. Cerebral arteriosclerosis (hardening of the blood vessels of the brain). 6. Cerebral thrombosis (a blood clot in the blood vessels in the brain tissues). 7. Acute cerebral encephalomalacia (a diseased condition of brain tissues, a sudden softening of the brain substance itself). 8. Pulmonary congestion and edema with interstitial hemorrhage (congestion of the lungs with the blood escaping out of the vessels into the tissues, an abnormal amount of fluid in the lungs). 9. Pulmonary atelectasis (collapsing of the blood vessels of the spaces in the lungs). 10. Chronic cholecystitis and cholelithiasis (inflammatory process of the gall bladder, stones in the gall bladder). 11. Endocervicitis, chronic (inflammation of the cervex, within the body of the uterus). 12. Senile uterus, tubes, and ovaries (aged genital system of the female). 13. Hemangioma of the liver (gross) (a hemorrhagic condition in the liver, a blood clot in the liver itself). 14. Fibrosis of the spleen (a growth or hardening of the tissues of the spleen)."

Contestant's medical witness Miller testified that "a lot of these names given here are conditions that are found under the microscope * * *. These are things that are found in the laboratory." Contestant's additional medical testimony tended to show that if a tumor or growth in the brain tissues makes pressure upon it, the pressure begins to interfere with and to alter the speech and to affect the mind, causing one to become forgetful, "and so forth." "Where the brain is affected it would naturally affect everything that the brain has control over," and would affect a proper functioning of the brain tissues and it "would certainly affect a person's understanding of the relatives that they had." Many of the mentioned diseases would not appear suddenly, a growth, a cerebral thrombosis and glioma with encephalomalacia would not.

Proponent's rebuttal evidence tended to show that testatrix had high blood pressure and suffered a stroke, or clot in the brain in February 1950; that she recovered from this stroke but not from the one in June 1950, which was much more extensive than the first; that she was of sound mind before she was discharged from the hospital in April 1950; that, when she came to the hospital the second time, she had pulmonary atelectasis, a hemorrhage of the lungs which is almost always fatal; that, although most of the diseases listed on the pathologist's report were not diseases that came on suddenly, some of them, such as cerebral thrombosis, arterial occlusion and pulmonary hemorrhage, do; that these things were matters which testatrix did not have on May 1, 1950; that general arteriosclerosis is brought on through the years and would not necessarily affect testatrix' mind, "since a lot of people go around every day with that condition conducting their business and have as good a mind as anyone"; that testatrix had no

softening of the brain; and that the finding of the post-mortem examination proved there was no brain tumor. Proponents also offered a number of witnesses whose testimony tended to show that during the period from April 10, 1950 to June 22nd, testatrix' mind was all right, she talked naturally and sensibly, and had a sound mind. Some of these witnesses saw her and talked to and visited with her every day.

Proponent's evidence made out a prima facie case of testamentary capacity and of the due and formal execution of the will. The questions now presented are whether contestant offered any substantial evidence from which an inference of testamentary incapacity on May 1, 1950, could be drawn or offered any substantial evidence that the alleged will was the result of the undue influence, domination and control of Mary J. Bruce over the mind of testatrix.

■ In determining the sufficiency of contestant's evidence on these issues, we must accept her evidence as true, disregard proponent's evidence unless it aids contestant's case and give contestant the benefit of every favorable inference that may be legitimately drawn from the whole evidence. Her evidence must, of course, be considered as a whole and outstanding conceded facts may not be disregarded.

■ On the issue of testamentary capacity, evidence of testatrix' condition before and after the date of the execution of the will has no probative value, unless it raises a reasonable inference as to testatrix' mental condition at the time she signed the will. Walter v. Alt, 348 Mo. 53, 152 S.W. 2d 135, 142; Smith v. Fitzjohn, 354 Mo. 137, 188 S.W.2d 832. "'A testator with mind enough to understand,' the ordinary affairs of life, the kind and extent of his property, who are the natural objects of his bounty, and that he is giving his property to the persons mentioned in his will, in the manner therein stated, is capable of making a will under the law of this state." Rex v. Masonic Home of Missouri, 341 Mo. 589, 108 S.W.2d 72, 84; Pulitzer v. Chapman,

337 Mo. 298, 85 S.W.2d 400, 414–416; Walter v. Alt, supra.

■ We have reviewed at length contestant's undisputed evidence with reference to the general situation concerning testatrix, her illness, her hospitalization, her return to her home and her condition and activities. No inference of testamentary incapacity on May 1, 1950 can be drawn from the facts and circumstances shown to have taken place or to have existed prior to said date. This evidence tends to show testamentary capacity. No lay witness gave an opinion as to testamentary incapacity, or testified to any facts or circumstances upon which an opinion of testamentary incapacity on that date could be based. Smith v. Fitzjohn, supra; Lee v. Ullery, 346 Mo. 236, 140 S.W.2d 5, 9. Dr. Miller testified to no condition of a permanent and continuing nature. The time fixed by him was remote from the date of the execution of the will and the record contains much evidence that the mental condition of testatrix changed prior to May 1, 1950. See Fendler v. Roy, 331 Mo. 1083, 58 S.W.2d 459(5–7).

We have also reviewed the evidence specifically relied upon by respondent to show that, on May 1, 1950, testatrix was suffering from an acute brain disease, to wit, with softening of the tissues and brain tumor, "along with other chronic physical conditions which rendered her mentally and physically incompetent to know what she was doing." Reliance is placed upon medical evidence to the effect that the diseases shown by the death certificate and the post-mortem examination did not appear suddenly, but had a prior existence; and that they would tend to affect the understanding, memory and mental faculties of the person affected. There is, however, no evidence from which the severity or extent of any of these diseases on May 1, 1950, can be determined, nor is there any evidence from which it can be determined that any or all of these diseases affected or could have affected the mind of the testatrix on that date to such an extent that she did not have, or could not have had, testamentary capacity to execute the will.

While proof of the existence of such diseases on June 25, 1950, might sustain an inference as to their existence at some period prior thereto, there was no evidence that they did exist to any specified extent on May 1, 1950, or to any particular effect, or so as to render testatrix incompetent to make a will on that date and no inference to that effect could reasonably be drawn from contestant's evidence. Inferences of fact and presumptions do not run backward to the extent claimed. See State v. Janes, 318 Mo. 525, 1 S.W.2d 137, 138(2); Conduitt v. Trenton Gas & Electric Co., 326 Mo. 133, 31 S.W.2d 21, 26(14); Snowwhite v. Metropolitan Life Ins. Co., 344 Mo. 705, 127 S.W.2d 718, 722(4); Nash v. Normandy State Bank, Mo.Sup., 201 S.W. 2d 299, 303(6); Bolomey v. Houchins, Mo. App., 227 S.W.2d 752, 757. To make a submissible case of testamentary incapacity there must be evidence of such incapacity at the time the will was executed.

■ Did contestant make a case for the jury on the issue of undue influence? "By 'undue influence' is meant such influence as amounts to force, coercion, or overpersuasion, which destroys the free agency and will power of the testator." Sehr v. Lindemann, 153 Mo. 276, 289, 54 S.W. 537, 540. "Undue influence, to be effective in breaking a will, must have been present, in active exercise, and sufficient to destroy the free agency of the testator at the time of the making of the will, so that the will is not 'in fact his own will, but that of the party who was exercising the undue influence.' * * * But the law does not ban as undue the natural influence of affection or attachment or the desire to gratify the wishes of one beloved or trusted by testator." Beckmann v. Beckmann, 331 Mo. 133, 52 S.W.2d 818, 823; Larkin v. Larkin, Mo.Sup., 119 S.W.2d 351, 358; Kadderly v. Vossbrink, Mo.Sup., 149 S.W.2d 869, 874. "Undue influence need not be shown by direct evidence. It may be shown indirectly and arise as a natural inference from other facts in the case. It must not rest on mere opportunity to influence, or on mere suspicion." Teckenbrock v. McLaughlin, 209 Mo. 533, 550, 108 S.W. 46,

51; Fowler v. Fowler, 318 Mo. 1078, 2 S.W. 2d 707; Baker v. Spears, 357 Mo. 601, 210 S.W.2d 13, 17. However, "it is fundamental that it is not the existence of undue influence but the exercise of it in the execution of the will which invalidates such will." Gibony v. Foster, 230 Mo. 106, 137, 130 S.W. 314, 324; Welch v. Welch, 354 Mo. 654, 190 S.W.2d 936, 938. "It must appear that the influence was actually exercised to an extent that the will of the testatrix was controlled against her will." Neal v. Caldwell, 326 Mo. 1146, 34 S.W.2d 104, 110.

■ Respondent contends that she was the natural object of testatrix' affections; that testatrix had always planned for her to have the property; that their relationship was extremely cordial; that testatrix' physical condition resulting from the stroke or cerebral hemorrhage in February 1950 and the progressive disease of the tissues of the brain affected her mind and made her vulnerable to undue influence. These facts were insufficient to show the exercise of undue influence. Respondent further points to proponent's evidence that Rev. Smith visited testatrix at the hospital and told her "what was going on" at her home and about a telephone being moved to another room; that testatrix told him she would "fix her business straight," when she got home; and that she was going to make a will giving all of her property to Mrs. Bruce. No relationship between Rev. Smith and appellant appears from this record. Respondent further says that appellant procured the subscribing witnesses and was present when the will was executed. The record shows that she called the witnesses at the direction of testatrix, but there is no evidence that she was in the room when the terms of the will were discussed or when the will was signed. The evidence indicates that she was in the house, but not the room. Further respondent says "the record fails to show any services rendered by appellant to testatrix prior to the execution of the will"; and that testatrix "imagined that she was obligated to appellant." It is admitted that appellant was testatrix' housekeeper and contestant's evidence shows that appellant was

seen frequently at the home of testatrix assisting her before and after testatrix was in the hospital. Respondent says that it was not until the mind of testatrix was affected did she give way *"to the persuasion of appellant* who induced her to make the will with her (appellant) as beneficiary"; and that "in this case a very ill old lady *was caused and persuaded* to do in the last few days of her life that which was a complete reversal of what she had always planned to." (Italics ours.) The record contains no evidence from which an inference can be drawn that the will was the result of undue influence of appellant over the mind of testatrix, or that appellant was active in causing the execution of the will. The trial court erred in not directing a verdict in favor of the will as requested by appellant at the close of all the evidence.

Respondent's motion to dismiss the appeal for alleged violation of the rules of this court is overruled.

The judgment is reversed and the cause remanded with directions to enter judgment sustaining the will. It is so ordered.

All concur.