RUBY DARBY, by next friend, v. BERRYMAN HENWOOD, Trustee for the ST. LOUIS-SOUTHWESTERN RAILWAY COMPANY, and L. W. BALD-WIN and GUY A. THOMPSON, Trustees for the MISSOURI PACIFIC RAILWAY COMPANY, Appellants.—145 S. W. (2d) 376.

Division One, December 11, 1940.

*Oliver & Oliver* and *Spradling & Strom* for appellants.

*Rush H. Limbaugh* for respondent.

BRADLEY, C.—This is an action to recover $10,000 under the compensation section of our death statute, Sec. 3263, R. S. 1929, Mo. Stat. Ann., p. 3371, for the death of plaintiff's husband alleged to have been caused by the negligence of defendants. At the close of plaintiff's case the court gave a peremptory direction to find for defendants, and thereupon she took an involuntary nonsuit with leave to move to set the same aside. Motion to set aside was duly filed and sustained and defendants appealed.

We shall refer to the St. Louis-Southwestern Railway Company as the Cotton Belt, and to the Missouri Pacific Railway Company as the Missouri Pacific. About 3 A. M., on the night of October 31, 1937, plaintiff's husband, Lon Darby, was found, fatally injured, lying near the Cotton Belt track and about 250 or 300 feet south of the station and intersection of the Cotton Belt and the Belmont branch of the Missouri Pacific, at Delta, Missouri. He was unconscious when found, and so remained, and died about 24 hours thereafter. For the purpose of the statement we may say that the Cotton Belt track extends north and south through Delta, and is straight from a point about a mile north of the station down to the point where deceased was found. A southbound Missouri Pacific through freight, without stopping, passed through Delta, on the Cotton Belt track, at 2:22 A. M., on the night of October 31st, and 17 minutes thereafter, a southbound Cotton Belt through freight, without stopping, passed through. There are no eyewitnesses, but the circumstances support the inference that one of these trains struck the deceased.

It is alleged that both the Cotton Belt and the Missouri Pacific use the Cotton Belt track through Delta, and public user by pedestrians of the track where deceased was found was also alleged. There is no allegation and no evidence as to which of the two trains struck deceased. It is alleged that a "freight train being run and operated by defendants, ran southwardly over said railroad track through the town of Delta, crossed the railroad intersection and the intersection of the street or highway immediately south of said railroad intersection, and ran upon and against the said Lon Darby as

he was on said railroad right of way, and said freight train then and there struck the said Lon Darby, whose back was turned toward said approaching freight train and who was oblivious to the approach of said freight train.''

And it is alleged that ''the death of the said Lon Darby was caused by the said freight train, then and there being operated by defendants, . . . striking him . . . while it was being run and operated at a speed of fifty (50) miles an hour, and the death of the said Lon Darby was directly caused and occasioned by the negligence of the defendants . . . as follows:''

(1) Failure to sound the whistle or ring the bell, 80 rods from the public road crossing (south of station) as required by statute and town ordinance; (2) operation of the train over the railroad intersection at a high, dangerous, and excessive speed, without slackening the speed, and without blowing the whistle, ringing the bell or giving any signal of approach; (3) violation of the humanitarian rule.

The separate answers were general denials and pleas of contributory negligence.

James Moore testified that he had lived in Delta 40 years; was Cotton Belt section foreman and had been for 28 years; that he ''almost grew up with Delta;'' that deceased had worked on the Cotton Belt section at Delta for four years, but not regularly; that he (deceased) worked October 31st, but quit about 4 P. M.; that he did not see him any more until about 2 A. M. next morning; that he (witness) was going to the station to get a check that he expected on a train due at 3:11 A. M., and, that on the way, he saw deceased, and that, from a restaurant, they walked east on the Chaffee public road which crossed the Cotton Belt track about 50 feet south of the station; that when they reached a wagon road, about 10 feet west of the Cotton Belt track, he (witness) turned north to the station and deceased turned south towards his father's house which was about 200 feet south of the Chaffee public road. The record shows that the wagon road, down which deceased turned, extends only to the home of his father.

Moore further testified that deceased was drinking enough to make him stagger; that when deceased left him ''he told me he was going to his father's house. . . . I asked him, when he turned off, if he wanted me to go to the house with him . . . and he said, 'No, I can make it all right.' . . . Darby said something to me about a train. When we was coming across the Frisco, probably 150 feet (away), the passenger train going north pulled out. He said, 'Mr. Moore, what would you say if I was over there and jumped in front of that train and let it kill me?' I said, 'Lon, get such stuff out of your head.' He said, 'Well, I would sure jump in front of· it and let it kill me if I was over there.' . . . He said him and his wife was having trouble and he was going to end it. He said, 'that

will end the whole thing.' He had made a statement like that to me before. . . . I don't remember how long before that, several different times, he talked to me about it. He didn't say why, he just said that they was not getting along well and it didn't suit him and he didn't aim to put up with it."

Moore further testified that he had been in the station about 22 minutes when the southbound Missouri Pacific freight train passed on the Cotton Belt track; that it passed at 2:22 A. M.; that he paid no attention as to whether it slowed down; and could not tell as to its speed; that he could not say whether the whistle was blowing; did not remember whether the bell was ringing; that he was reading a newspaper and paid no attention. He also testified that the southbound Cotton Belt freight train, known as the Blue Streak, passed through at 2:39 A. M.; that he did not know how fast it was traveling; that he did not think it stopped and could not say whether it slowed down or not, and that he did not know whether the bell was ringing or the whistle was blowing. Reminded on cross-examination of a statement that he made to the Cotton Belt claim agent on the second day after injury to deceased, Moore said, "In the statement I said I heard the train whistle. I said the head light was burning on the engine. I said the bell was ringing. . . . The statement is correct. At that time I guess I remembered."

Moore further testified that shortly after the two freight trains passed, Jesse Brown, a section man, came into the station and said that a man was at the side of the track, down below the station, and that he did not know what was the matter with him; that he and Brown and a Mr. Peters "went down there. . . . We found Lon Darby lying there. He was about 250 feet from the station. With reference to the Cotton Belt railroad, he was lying to the right of the rail going south, on the outside. It would be on the west side . . . Relative to the railroad track, his body was such that he was lying with his face off the end of the ties, and his body was lying off of the ballast; it was not lying straight up and down the track. His feet were farther away from the track than his head. His head was about 16½ inches from the west rail. . . . The left side of his face was down. . . . We did not have a light; it was not moon light, but the street lights and the light from the depot show there. . . . That light was sufficient for us to see him after we got closer to him. He was fully dressed; his shirt was torn on his right shoulder. . . . He was about 120 feet north of the house (his father's). His cap was found below his father's house. . . . The cap had been cut up some; it looked like the train cut that on the rail. He (one who found the cap) found it sticking on the angle bar, and the wheels had chewed the cap up some. . . . There was blood at the place we found his body. That blood was on the ballast."

Dr. W. W. DeVault testified that he was called to see deceased on the night of October 31, 1937, and saw him between 3 and 4 A. M., and found him in the following condition: ''He was unconscious and had bled quite a lot, and he had a large hole in the occipitoparietal part of his skull; that is on the right side, kind of backwards of his head, and there was a destruction of tissue. There was no skin to cover the hole, just a gapping hole. I prepared my hands and didn't have time to boil a rubber 'glove, but dipped my finger in iodine and slipped it in there and saw the large hole. I didn't do any more than dress the wound and told them if they wanted to do anything further they might take him to the hospital. You could see brain substance and I didn't have much hopes for him. The head injury was more than a fracture. The skin was mashed or destroyed and left a large open hole and you could tell a good part of the skull was absent. It was either mashed down in the brain substance or else it had slipped under the scalp or other places, fallen out, maybe. I could see brain tissue. You could see loose brain tissue, but none had come outside. . . . There was a scent of alcoholic liquor on the breath of the man. There was no way for me to determine to what extent he was under the influence of liquor; it wasn't a strong scent, but I noticed it. I supposed he had been drinking beer; it smelled like he had been beer drinking.''

Plaintiff testified that she, her husband, and two children were at the time living in Delta, in the home of her father; that he (deceased) had worked ''off and on for the Cotton Belt about four years;'' that shortly before his death he had worked, as assistant section foreman, for the Cotton Belt in East St. Louis; that, as she understood, he went to East St. Louis to learn to be a section foreman; that he had been home one week before his injury; that he ate supper on October 31st, at home, and went to town; that she saw him up town about 9 o'clock; that he returned home with her, but did not go into the house, said he was going back to town and from there to his father's. Plaintiff's father lived in a small house, and had company that night, his sister and her husband, but plaintiff said that there was no particular reason why her husband should not have stayed at home. Plaintiff further testified that she and deceased, that night, were expecting a check for the East St. Louis work on the train due at 3:11 A. M. Also, plaintiff and others testified as to the use of the track by pedestrians.

As stated, the circumstances support the inference that deceased was struck by one of the freight trains that passed through Delta a short time before he was found lying by the track and fatally wounded, and, absent evidence to the contrary, the presumption is that at the time of injury deceased was exercising ordinary care for his own safety (Cahill v. Chicago & A. Ry. Co., 205 Mo. 393, 103 S. W. 532; Fox v. Mo. Pac. Ry. Co., 335 Mo. 984, 74 S. W. (2d)

608, l. c. 611, and cases there cited), and also the presumption is that deceased did not commit suicide. [State ex rel. City of St. Charles v. Haid et al., 325 Mo. 107, 28 S. W. (2d) 97, l. c. 103; Cech et al. v. Mallinckrodt Chemical Co., 323 Mo. 601, 20 S. W. (2d) 509, l. c. 511.]

A demurrer to the evidence "can be sustained only when the facts in evidence and the legitimate inferences to be drawn from such facts are so strongly against plaintiff as to leave no room for reasonable minds to differ." [Young v. Wheelock et al., 333 Mo. 992, 64 S. W. (2d) 950, l. c. 954, and cases there cited.] "The party demurring admits the truth of the testimony, to which he demurs, and also those conclusions of fact which a jury might draw from that testimony. Forced and violent inferences he does not admit." [Lappin v. Prebe et al., 345 Mo. 68, 131 S. W. (2d) 511, l. c. 513.]

We will assume, without deciding, that the evidence, as to user was sufficient to make it the duty of defendants to exercise ordinary care to discover those who might be on or near the track at the place where deceased was found, but the presumption of due care and against suicide, and the duty to keep a lookout do not of themselves make a case. The burden was on plaintiff to adduce evidence that one or both railroads were guilty of negligence in respect to one or more of the acts of negligence charged. As stated, the alleged grounds of primary negligence were failure to sound the whistle or ring the bell 80 rods from the public crossing, and the running over the railroad intersection without slackening speed and without blowing the whistle, ringing the bell or giving any signal of approach. Witness Moore was the only one who said anything about whistles, bells, slowing down, speed, and it cannot be said that his evidence is sufficient to make a case on either ground of the alleged primary negligence.

Able counsel makes no attempt to point out the evidence that would make a submissible case under the humanitarian doctrine, and our attention is directed to no case that supports submission, under the facts here, under the humanitarian rule. As ruled in the Lappin case, supra, a demurrer to the evidence does not admit violent inferences of fact. There is no evidence as to the speed of either train, how far deceased might have been seen if he was walking on or near the track, sitting on it or near it, or lying on or near it. There was no evidence as to distance in which either train might have been stopped.

The presumption that deceased was in the exercise of due care does not carry with it the presumption that the defendants, or either of them, were negligent, and no presumption of negligence, as to either railroad, arises from the fact that deceased was struck and killed by one of the trains. [Whiteaker v. Mo. Pac. Ry. Co. (Mo. App.), 15 S. W. (2d) 952, l. c. 955.]

There is no occasion to extend this opinion. The judgment setting aside the nonsuit should be reversed and the cause remanded with direction to enter a judgment of dismissal of the cause. It is so ordered. *Hyde, C.,* concurs; *Dalton, C.,* not sitting.

PER CURIAM:—The foregoing opinion by BRADLEY, C., is adopted as the opinion of the court. All the judges concur.