Robert SCOTT, a Minor, by His Next Friend
and Natural Guardian, Rowena Scott.
Plaintiff-Respondent,

v.

TERMINAL RAILROAD ASSOCIATION
OF ST. LOUIS, a Corporation,
Defendant-Appellant.

No. 45082.

Supreme Court of Missouri.

Division No. 1.

June 11, 1956.

Motion for Rehearing or to Transfer to Court
En Banc Denied July 9, 1956.

Warner Fuller, Arnot L. Sheppard, St. Louis, for (defendant) appellant.

George R. Gerhard, St. Louis, for respondent.

WESTHUES, Judge.

Plaintiff Robert Scott, a minor, by his next friend and natural guardian, Rowena Scott, obtained a jury verdict and judgment in the sum of $60,000 against the defendant Terminal Railroad Association of St. Louis, a corporation, as damages for personal injuries alleged to have been sustained by Robert as a result of defendant's negligence. The trial court overruled defendant's motion for new trial and defendant appealed.

The defendant railroad briefed a number of points including the question of the sufficiency of the evidence to sustain a verdict for plaintiff. We have concluded that the evidence does not support a finding of negligence and, therefore, we shall direct our attention to that question.

At about 4:30 p. m., on April 17, 1951, the plaintiff Robert Scott, then five years old, lost his left leg when he was run over by a train in the 300 block of Antelope Street in St. Louis, Missouri. Antelope Street is an east-west street. South of this street defendant owns a right of way. Along the north edge of this right of way, there is a fence consisting of steel rails supported by posts. This fence is 25 or 30 feet north of the north rail of defendant's track. Along the north side of Antelope Street is a string of houses or apartments with no

space between. Plaintiff lived in one of these houses. On the afternoon of April 17, 1951, at about 4:30 p. m., one of defendant's trains consisting of a double-unit diesel locomotive and about 61 cars passed over the track at Antelope Street at a speed estimated at 6 to 10 miles per hour. The 61 cars were delivered to the M-K-T Railroad Company yards which were located to the east. The plaintiff's mother testified that about 4:15 p. m., she had mopped the kitchen "and Bobby came in and he wanted something to eat, and I gave it to him, peanut butter and crackers, and—

"Q. Peanut butter and crackers? A. Yes, sir.

"Q. Is that right? A. That's right.

"Q. At that time was Bobby in school? A. No, he was down; he had the chicken pox. He was just gettin' over those.

"Q. But he was home; is that correct? A. Yes, sir.

"Q. Now, after you gave him the peanut butter and cracker sandwich, what did you do? A. Well, he wanted to go out, so he went out the front, and so I thought to myself I'll go empty my garbage and then I'll fix the youngster some supper, and then that's when it all took place.

"Q. Well, you just tell us, Mrs. Scott, what happened after that. A. Well, I went out and emptied my garbage and I burnt my papers, then Mr. Winkler called to me and he told me, he said, 'Bobby's been hit by the train,' and—a I passed out in my kitchen, and Mr. Winkler brought me to and we went through Mr. Winkler's yard and out to the car, and they took my boy to the hospital then."

Witness Billy Roden, who lived at 315 Antelope Street, testified that about the time of the accident, he had occasion to step through the front door of his home located north of the tracks; that as he looked to his right trying to locate his brother-in-law, he heard a scream to his left out on the railroad and "saw Bobby Scott dragging his leg off'n the track. * * * Well, when I first observed him, he had either just cleared his foot from the rail or was dragging his heel off of the rail. I couldn't be positive on that. * * * he had his head up and he was screaming." Mr. Roden further testified that the train was moving 6 to 8 miles per hour; that he took Bobby to his home and he and a neighbor "knocked and hollered and couldn't raise anyone," so they took Bobby through a neighbor's house to the back where Bobby's mother was and from there two of the neighbors took Bobby to a hospital. Mr. Roden stated that after the neighbor had left with Bobby, he went to the front of his house and saw the caboose of the train "about fifty feet past the Hall Street crossing" which was 100 feet beyond the point where Bobby was injured. Mr. Roden stated that it was 3 to 5 minutes from the time when he first saw Bobby and the time he came out again and saw the caboose.

On cross-examination, Mr. Roden testified as to what he observed and we quote from his evidence:

"Q. Mr. Roden, when you picked Bobby up, did you see either end of the train? A. I—I was not observing the train, sir; I did not see either end.

"Q. Well, you say it was going from six to eight miles an hour? A. In the vicinity of that; yes, sir.

"Q. Well, I mean approximately? A. Yes, sir.

"Q. And you had already opened the door and looked down towards the Inn on Antelope Street before you heard him scream, hadn't you? A. Yes, sir.

"Q. And you immediately looked to see? A. Yes, sir.

"Q. And you found him as you have already described? A. Yes, sir.

"Q. And I assume that when you opened the door first, and before you looked down, you were close enough

to him to have heard him if he had been screaming then? A. Well, sir, may I phrase it this-a-way: At my front door, when you walk out, you have to look to your right to see the— the tavern.

"Q. Yes? A. And just to your left, lookin' just to your left, you see where the accident happened.

"Q. Yes? A. I don't recall exactly whether I looked toward the tavern, or what happened. That's been four years ago.

"Q. Yes? A. If—if I looked toward the tavern, I know it was just momentarily, and then I glanced to my left.

"Q. Yes. And then you heard him scream, when you glanced to the left? A. When I glanced, he was screaming then; yes, sir.

"Q. Yes. That's what made you look there? A. Yes, sir."

Members of the train crew were called as witnesses for plaintiff. Each of them testified that he did not see Bobby and did not know of his being hurt until they reached the "Katy" yards. The engineer and fireman on the head locomotive testified that they kept a lookout ahead and did not see Bobby; that the diesel unit did not strike plaintiff.

A police officer testified that an inspection was made of the train in question to determine if there was any evidence of whether it was this particular train that injured Bobby. No evidence was found; however, the inspection was not such as would establish such fact to a certainty. Only the outside of the wheels of the cars was inspected. The train of cars had been spotted in the yard designated for it and the diesel unit had been moved to another part of the yard and whether it was inspected was not shown.

Defendant in its brief contends that it owed plaintiff no duty "save not wilfully and wantonly to injure him; since he was a trespasser upon defendant's private right of way." Section 389.650, subsection 6, RSMo 1949, V.A.M.S., was cited. Defendant says further that the fence constructed along the right of way was notice to all that the enclosure was private property. Plaintiff introduced evidence tending to show that children had been playing on the defendant's right of way for a number of years. Plaintiff says that defendant had the duty to be on the lookout for children where plaintiff was injured. For the purpose of this case, we shall assume that it was defendant's duty to use ordinary care and to keep a lookout for children on the right of way at the 300 block on Antelope Street.

Plaintiff submitted his case to the jury on the theory that defendant failed to keep a reasonable lookout for him. Plaintiff says "had the defendant exercised ordinary care in keeping a lookout, plaintiff could have been seen; * * *". There is no evidence in this case that plaintiff was on defendant's track or on the right of way as the locomotive approached the point where plaintiff was injured. There is no evidence from which such an inference may be drawn. A very short time elapsed from the moment plaintiff was given a peanut butter sandwich and the time he was injured. The train was approximately 3,000 feet long. It would require several minutes for it, traveling 6 to 8 miles per hour, to pass the point where plaintiff was injured. Mr. Roden, who picked plaintiff up from the point at the rail, said he did not see either end of the train. Bobby's screams attracted his attention and he immediately ran to his aid and brought him to plaintiff's mother. The mother's testimony was that after she had given the boy a sandwich, he went out and she "went out and emptied my garbage and I burnt my papers, then Mr. Winkler called to me and he told me," about the son's injury. Bobby must have wasted no time in getting to the railroad tracks. None of this evidence is in conflict with the evidence of the train crew, that is, that Bobby was not on the tracks ahead of the locomotive and was not on the right of way where he could have been seen by the engine crew. Plaintiff, recognizing that the evidence does

not show he was on the track ahead of the locomotive, says in his brief, "There is no principle of law that requires the plaintiff to be on the tracks ahead of the engines, nor for the leading end of the engines to strike him for plaintiff to recover on his submission of defendant's failure to keep a reasonable lookout ahead and laterally; the failure to keep a lookout laterally is negligence."

Plaintiff says the evidence of Ara Woods Ellison shows conclusively that Ellison, the fireman on the front locomotive, did not keep a lookout laterally. The evidence on which plaintiff bases this contention is as follows:

"Q. On this particular day, April 17th, going eastbound, it's your testimony that you saw no one north of the tracks between the tracks and that fence; is that correct? A. That's correct.

"Q. Did you see anyone up on the porches, such as a little boy eating a sandwich, or anything like that? A. No, I never paid any attention to that because I've got my eyes set forward all the time. I've got to be on the alert, you know.

"Q. Well, wouldn't your vision take in the porches, Mr. Ellison, as you're rounding that curve? A. Well, it would if I permitted it, but I just didn't permit that.

"Q. Sir? A. It would if I permitted it, but I don't permit it; I'm lookin' ahead all the time.

"Q. You mean that you make yourself keep your vision directed within that fence; is that correct? A. That's right.

"Q. You don't let yourself look outside the fence? A. No, sir."

■ Plaintiff has cited no case holding that it was the duty of the fireman to observe children playing or sitting on porches beyond the railroad right of way on Antelope Street. The duty to keep a lookout laterally does not extend that far. Cases cited by plaintiff do not support plaintiff's theory. The cases cited, Patton v. Hanson, Mo., 286 S.W.2d 829, and Johnston v. Owings, Mo.App., 254 S.W.2d 993, involved collisions on public roadways and the question of proper lookout was with reference to a failure to discover motor vehicles using the roadways. In Turnbow v. Kansas City Rys. Co., 277 Mo. 644, 211 S.W. 41, a small child was struck by the wheels of the hind truck of a streetcar. The evidence was that the child was in the street moving toward the streetcar and only a few feet from the track as the front end of the car passed the child. The court held that it was the duty of the operator of the car to keep a lookout laterally. In Burnam v. Chicago Great Western R. Co., 340 Mo. 25, 100 S.W.2d 858, plaintiff's evidence was that children had been playing in the railroad switchyard (where plaintiff was injured) near and underneath box cars with the knowledge of the railroad employees. Plaintiff was injured when a car under which he had been playing was moved. It was held that the evidence justified a submission of the case to a jury on the theory that the train crew should have discovered the child before moving the car. In each of those cases, there was evidence that the injured party was in a place where discovery should have or could have been made, but in the case before us, no evidence was offered either directly or indirectly that plaintiff was upon the defendant's right of way as the diesel unit passed the point where the plaintiff was injured.

■ ■ Plaintiff also cited cases which hold that where there is a duty to keep a lookout, "whether or not the plaintiff was actually seen is of no moment, since to look is to see." That principle of law would be applicable in this case except for the reason that the evidence failed to show plaintiff was on defendant's right of way where the engine crew could have discovered him. The fact that plaintiff lost his leg under this slowly moving train 3,000 feet long is not in conflict with the evidence of the engine crew that plaintiff was not there when their train approached the point where plaintiff

was injured. In fact, the evidence rather supports a theory that plaintiff entered the right of way after the diesel unit had passed. The whole matter is left to speculation. One guess is as good as another. In such circumstances, liability cannot be imposed. There must be evidence to support a finding of negligence. Van Brock v. First National Bank in St. Louis, 349 Mo. 425, 161 S.W.2d 258, loc. cit. 260, 261(1–3); Darby v. Henwood, 346 Mo. 1204, 145 S.W. 2d 376; Bates v. Brown Shoe Co., 342 Mo. 411, 116 S.W.2d 31, loc. cit. 33(1); Bowers v. Columbia Terminals Co., Mo.App., 213 S. W.2d 663, loc. cit. 670(9.10); Schoen v. Plaza Express Co., Mo., 206 S.W.2d 536; Draper v. Louisville & N. R. Co., 348 Mo. 886, 156 S.W.2d 626, loc. cit. 634(13).

The judgment is hereby reversed.

All concur.