Mrs. Lucia MARTINEZ, by Douglas P. Martinez, Curator and Personal Representative, Appellant,

v.

MISSOURI PACIFIC RAILROAD COMPANY, a Corporation, Respondent.

No. 47135.

Supreme Court of Missouri,
Division No. 1.

Sept. 14, 1959.

Motion for Rehearing or to Transfer to Court en Banc Denied Oct. 12, 1959.

Gardner & Gardner, Monett, for appellant.

George W. Holmes, Mark M. Hennelly, Allen D. Churchill, St. Louis, for respondent.

DALTON, Judge.

Action for damages for the wrongful death of Edward P. Martinez under the last clear chance doctrine of the State of Louisiana. Martinez, hereinafter referred to as the deceased, an off-duty employee of the Texas & Pacific Railroad, was killed by defendant's train in the joint yards of the Missouri Pacific and Texas & Pacific Railroads in Alexandria, Louisiana, on October 23, 1953. Verdict and judgment were for plaintiff for $75,000, but the court on motion set aside the verdict and judgment and entered judgment for defendant and, in the alternative if the judgment should be reversed on appeal, overruled defendant's motion for a new trial on condition that plaintiff remit $25,000 from the amount of the verdict, otherwise the motion for a new trial would be sustained. Plaintiff has appealed and now contends that plaintiff made a submissible case for the jury; and that the court erred in granting defendant's motion to set aside the verdict and judgment and in entering judgment for defendant in accordance with defendant's motion for a directed verdict filed at the close of all the evidence.

On a prior appeal of the cause involving the statute of limitations a judgment of dismissal was reversed and the cause remanded. Martinez v. Mo. Pac. Railroad Company, Mo.Sup., 296 S.W.2d 90.

In disposing of the issues now presented we shall state the evidence favorably to the plaintiff and disregard defendant's evidence unless it aids the plaintiff's case. We shall closely follow appellant's preliminary statement of facts, but modifying it and supplementing it as we think the record requires.

At Alexandria, Louisiana, as indicated, the Missouri Pacific and Texas & Pacific Railroads have a common railroad yard, and a joint or interchange track agreement in the operation of their trains. In front of their depot there are several tracks. These tracks angle somewhat towards the northwest, but we will describe them as running north and south. The first track west of the depot is the passenger main. The track next to it is track "one and a half." Passenger trains coming into Alexandria have regularly assigned tracks. On the occasion in question No. 103, a Missouri Pacific train, came in from Little Rock, Arkansas, at 3:05 a. m., and was spotted on track 1½, which was its regularly assigned track. It was turned around, not by turn table, but by switching the coaches and rearranging them on this same track, and coupling a road engine to the north end of these coaches. The rearrangement was so that the train could go out, northbound, as passenger train No. 116, which was to head out for Little Rock at 4:30 a. m. A public street running east and west, known as Park Avenue, crossed these railroad tracks nearly a block north of where the locomotive was standing. Between the locomotive's location and the Park Avenue crossing there was a cross-over track from track 1½ to the passenger main, so that northbound trains made up on track 1½ could cross over onto the passenger main. The distance between these tracks was 8 feet. The cross-over was 186 feet in length. From the south switch of the cross-over to the south side of Park Avenue was 251 feet and 3 inches. A train of cars when made up on track 1½, as this one was, usually placed the locomotive from 20 to 50 feet south of the south switch of the cross-over. Park Avenue was a much used, heavy traffic street. Fifty feet north of the north side of this street was what the railroad employees referred to as "a pot signal", which was a signaling device near

the ground, to indicate (by the color of the light on it) whether there were any approaching cars or train on the passenger main, or whether it was clear and safe for use. It was the duty of the members of the engine crew to keep a careful lookout toward this "pot signal" and the Park Avenue crossing as the train left the depot going north.

On the morning of October 23, 1953, train No. 116 left the station on time (4:30 a. m.) and moved north to and over the cross-over to the passenger main and then north on that line, the same track it had come in over at 3:05 a. m. About one hour later, at 5:30 a. m., deceased's body was found on the passenger main line track some 36 feet north of the north line of the Park Avenue crossing. It was cut in two (completely severed) at the waist, with the upper part of the body between the rails and the lower portion, the hips and legs, on the outside of the east rail; both portions lying in close proximity to that rail and in alignment to each other. No one saw deceased on or near the tracks before his body was found.

As stated, the deceased at the time of his death was an employee of the Texas & Pacific Railroad, but he was not on duty at the time. He was a locomotive engineer and had worked for the company about forty years. He was a sober and religious man, had been regularly employed and enjoyed a normal home life. He lived in Alexandria a few blocks northwest of the Park Avenue crossing. On the early morning of October 23, 1953, between 2 and 4 o'clock he had been at the Blue Star Cafe. He came in with three others and sat with them and ordered an orange soda. He seemed normal and in possession of his faculties. When he left the cafe was not definitely shown, but apparently before 4:00 a. m.

The Blue Star Cafe was located a half block east of the passenger station and the deceased's home was located about a block and a half north and about a block and a half west of the Park Avenue crossing, near which crossing the body of deceased was found. A paved street extended directly north from in front of the Blue Star Cafe to a point near the Park Avenue crossing, but then it curved slightly to the northeast away from the direction of deceased's home. If deceased followed this street to the Park Avenue crossing after he left the cafe, he would have been on the most direct route to his house. If he had left the Park Avenue crossing and started across the railroad yards to where his body was found, he would also have been on a direct route to his house, but there was no evidence that he or anyone else had used this portion of the yards as a traffic-way. Deceased "usually" took a "regular route" and crossed the railroad tracks at the Park Avenue crossing, which carried pedestrian traffic. In going northwest from the station "it is the only way you could go."

When train No. 116 left the Alexandria station on the morning in question, the engineer was in his proper place on the right-hand side of the engine and the fireman was on the left-hand side. The conductor looked both ways before the train started to see that all was clear and that the headlight was on bright. He then took a position "about middle-ways of the vestibule" of one of the passenger coaches, looking out over the half door and, as the train pulled out, he did not see anyone on or near the tracks. He did not look forward after the train started moving. The train consisted of an oil-burning steam engine and six cars, to wit, "two baggage cars, a mail car, two day coaches and one pullman sleeper." From the station to the place where deceased's body was found the train moved at a speed of 3 to 5 miles per hour.

The engineer because of a heart condition was unable to testify either at the trial or by deposition. The fireman did not see the deceased at any time before or after the train left the depot. The fireman, a witness for plaintiff, testified that he was looking ahead at all times after the train started up and that the engineer was at his

post of duty. So far as the fireman knew there was no obstruction of any kind or curves in the track to prevent either him or the engineer from looking ahead and seeing any object on or about the tracks ahead of the train. The weather was dry and clear and there was no fog. The railroad yard was level. The headlight on the engine was turned on bright when the train left the depot and it illuminated the entire area along and on each side of the tracks ahead of the locomotive as it moved forward to reach the point where deceased's body was found. There was evidence that an object the size of a man on or near the track could have been seen by the train crew at a distance of seven to eight hundred feet. The fireman was positive that no one approached or came upon the track from his side of the train or within his view after the train left the depot. None of the members of the crew knew anything concerning the death of the deceased, until after the train reached Monroe, Louisiana. An inspection was ordered, when the train reached that point, and the inspection from below the pilot disclosed blood on the right front wheel, right front pony trucks of the engine, behind the pilot, but no blood was seen on the pilot. The air-brakes on the train were inspected before the train left the station at Alexandria and they were in perfect operating condition.

While not referred to in appellant's statement, the plaintiff's evidence as to stopping distances for the train in question was about as follows: At a speed of five miles per hour the particular train could have been stopped with reasonable safety to the equipment, passengers and crew members by an ordinary service application of the air-brakes in "possibly a hundred feet or more", "possibly between a hundred—two hundred feet, maybe." An emergency stop could be made in a shorter distance; however, an emergency stop was said to be safer at a high speed rather than at a low speed because of the "sudden stop" in the latter case. It wouldn't take "very far" to make an emergency stop of that kind of a train at three to five miles per hour, but an emergency stop could have been made with safety to the passengers within 150 to 200 feet. Other detailed facts will be stated in the course of the opinion.

The cause was submitted under the last clear chance doctrine of Louisiana by an instruction requiring a finding in part as follows: " * * * that, as said train pulled out and proceeded north from said depot, the deceased, Edward P. Martinez, was then on said railroad track ahead of said train and in a position of peril and danger of being run over by said train, and the said Edward P. Martinez was then and there in such condition or position that he could not extricate himself from such peril, if you find he was then in peril; and that the defendant's employees operating said train saw, or in the exercise of ordinary care could have seen deceased's perilous position, if you find he was in a perilous position, a sufficient distance from deceased and in time to have thereafter, by the exercise of ordinary care and with the means at hand, and with reasonable safety to themselves and to the equipment and passengers thereon, stopped said train, and thereby avoided injuring the deceased, but failed to do so, and that such failure * * * was negligence * * *."

Respondent concedes that, since the evidence tends to show that the casualty occurred in the State of Louisiana, the substantive law of that state applies. See O'Leary v. Illinois Terminal R. Co., Mo.Sup., 299 S.W.2d 873, 877; Haberly v. Reardon Company, Mo.Sup., 319 S.W.2d 859, 862(1); Barker v. St. Louis County, 340 Mo. 986, 104 S.W.2d 371, 378. As indicated, the case was submitted under the last clear chance doctrine of Louisiana which has been extended to include discoverable peril. Rottman v. Beverly, 183 La. 947, 165 So. 153; Jackson v. Cook, 189 La. 860, 181 So. 195; Shipp v. St. Louis Southwestern R. Co., La.App., 188 So. 526. In the Shipp case the court held that a railway company was liable for the death of

an intoxicated person who fell asleep in the nighttime on a passing track near the business section of a town and was run over by a freight train, notwithstanding that the trespasser was grossly negligent, where his negligence was passive and inactive and the remote cause of the accident, and the engineer and fireman should have discovered the trespasser in time to have avoided the accident. Appellant also cites Frentz v. United States, D.C.E.D.La., 163 F.Supp. 698, 700 where the court said: "The Louisiana doctrine of last clear chance conforms to the doctrine generally. It recognizes the duty to discover the peril of another and to avoid injury if there is a reasonable opportunity so to do. In short, the doctrine requires that a negligent defendant be held liable to a negligent plaintiff if the defendant, aware of the plaintiff's peril or unaware of it through carelessness had, in fact, a later opportunity than the plaintiff to avoid the accident."

The Frentz case cites Brown v. Louisville & Nashville R. Co., D.C.E.D.La., 135 F.Supp. 28, 31 where the court said: "As applied by the courts of Louisiana, the doctrine of last clear chance is composed of the following elements: (a) plaintiff in a position of peril of which he was unaware or unable to extricate himself; (b) defendant in a position where he actually discovered, or should have discovered, the plaintiff's peril; (c) at such time that the defendant could have, by the exercise of reasonable care, avoided the accident. All three elements must be present before the rule may be applied. In other words, the doctrine requires that a negligent defendant be held liable to a negligent plaintiff if the defendant, aware of the plaintiff's peril or unaware of it through carelessness, had in fact a later opportunity than plaintiff to avert the accident." And see Young v. Thompson, La.App., 189 So. 487, 491; Russo v. Texas & Pacific R. Co., 189 La. 1042, 181 So. 485; Barnes v. Texas & New Orleans R. Co., La.App., 16 So.2d 600, 603; Belshe v. Gant, La.App., 92 So.2d 719, 723; Bergeron v. Dept. of Highways, 221 La.

595, 60 So.2d 4, 7. It will be noted that plaintiff's instruction set out above submitted a finding in conformity to the requirements stated in the Brown case.

■ The parties concede that the law of the forum governs all matters falling within the description of burden of proof, including the sufficiency of the evidence and the burden of going forward with the evidence; and, also, that the law of the forum governs presumptions and inferences to be drawn from evidence. Restatement, Conflict of Laws, Section 595, p. 710. And see Hopkins v. Kurn, 351 Mo. 41, 171 S. W.2d 625, 626, 149 A.L.R. 762.

Appellant in effect concedes that no evidence was offered tending to show when or how the deceased got onto the "passenger main" track. She says: "No one saw deceased on the railroad track or saw him come upon the track at any time before he was run over by the train." She then argues: "There being no evidence as to how and when deceased got onto the railroad track and into a position of danger and peril, a presumption obtains that he was at all times in the exercise of ordinary care, and did not commit suicide." Nevertheless, appellant contends that the evidence was sufficient for the jury to find the facts, as submitted by the instruction, to wit, that deceased was on the track "when the train left depot"; that he remained there alive, but "in such condition or position that he could not extricate himself"; and that he was in peril or danger from the train from the time it left the station until he was run over and killed. Appellant concedes that there is no liability on defendant, unless the deceased came upon the track a sufficient time and distance ahead of the train so that defendant in the exercise of ordinary care had the last clear chance to avoid injuring him.

In support of appellant's contention that the deceased was in fact lying across the east rail of the track on his stomach when the train left the station and when deceased was run over, and as evidence that

deceased was not standing upright, or walking, when struck by the train, appellant relies on evidence tending to show that, when discovered, the parts of deceased's body faced down, his hat was a few feet north of his head, his eye-glasses were not bent or broken, but near his head, as were his false teeth. The glass crystal of his watch was unbroken, although the back of the watch was scratched and it lay to deceased's right near the base of the east rail of the tracks. A flashlight was also near the body. While deceased's body was completely severed, deceased's coat, shirt and trousers were not torn, ripped or damaged, except for the path of the train wheels, and the deceased's clothes were clean, that is, free of grease or oil. Two blood stains were seen on east rail and ground where the body was found, the first covered an area approximately a foot in length, the second (a foot further north) was approximately two feet in length. The parts of the body were in alignment and not disfigured, except for the severance at the waistline. The legs were extended almost straight out from the east rail. Other evidence relied upon tended to show that the base of the pilot or cowcatcher of the engine was about four inches above the top of the rails. Defendant's evidence showed the rails were referred to as "85 pounds per yard rails", 5½ inches high when new.

Other evidence relied upon by appellant tended to show the deceased's body was taken by one undertaker and later transferred to another and, after it was prepared for burial and placed in the casket, deceased's son viewed the body from the waist up and noted that there was "some type of marking on the forehead", the right forehead, "it was like a bruise, * * * like a brush mark; something of that type", it wasn't "any indentation at all or anything of that type." There was no depressed area in the skull or forehead, or any other marks that could be seen. Appellant argues that a fall and a blow to the head or skull leaving few marks on the surface may result in immediate unconsciousness, or an internal cranial

hemorrhage, partial paralysis and consequent disability; and that "something of this sort must have occurred rendering the deceased incapable of extricating himself from peril and danger." We find this later evidence insufficient to sustain the inference sought to be drawn from it. It amounts only to speculation and conjecture. Appellant further argues that, from all of the circumstances existing when the body was found, the jury could properly draw an inference that deceased was on the track in a helpless condition before the train left the station. Appellant cites State v. Janes, 318 Mo. 525, 1 S.W.2d 137, 138, to the effect that "while the presumption of the continued existence of a proven fact does not run backwards, yet the surrounding circumstances may be such as to justify the inference that an established fact must have existed at a certain time in the immediate past." Appellant says that all of the circumstances point unerringly to the fact that deceased must have been found in approximately the same position that he was in "when the locomotive first touched him."

We may assume without deciding that the evidence hereinbefore reviewed was sufficient to sustain a finding that the deceased was prone upon the east rail of the passenger main when the train struck and passed over his body, yet we find no evidence sufficient to sustain an inference that deceased was either helpless or unconscious or was upon the track in such condition for a sufficient time and distance ahead of the train that the operators thereof in the exercise of ordinary care could have seen deceased and stopped the train and avoided injuring him.

The evidence offered tended to show the speed of the train, as it proceeded from the station to the location in question, at from 3–5 miles per hour to 10–12 miles per hour. Appellant considers the first figures more favorable. This gives a speed of from 4.4 to 7.33 feet per second. In her brief, appellant makes no reference to any evidence as to stopping distance of the train at the speed mentioned and we do not know

what time and distance for stopping the train the appellant considers the more favorable. Assuming, however, an emergency stopping distance of approximately 100 feet at 3–5 miles per hour, the evidence reviewed would not sustain a finding that deceased was on the track and in helpless peril approximately 100 feet in front of the train, or for any particular time or distance sufficient under the evidence for defendant's servants to have seen deceased on the track and have stopped the train with safety to the passengers and have avoided injuring the deceased.

To further support the contention that "the deceased was on the track ahead of the train in a position of peril when the train left the depot", appellant argues that "the possibility that deceased may have come onto the track and into a position of danger as the train traveled from the depot towards the place of accident * * * is mere speculation", because "there is positive testimony that this did not occur." Appellant says "if deceased did not come onto the railroad track and into a place of danger at any time after the train left the depot, he must have been there and in a place of danger when the train pulled out." Appellant further insists that the presumption that deceased was at all times in the exercise of due care for his own safety (which arises in the absence of evidence) "dispels any thought that the deceased may have stepped onto the railroad track immediately in front of the moving train"; and that this presumption is aided by the fact that deceased was a locomotive engineer and knew of the danger of stepping immediately in front of a moving train.

Appellant relies on the testimony of the fireman, as hereinbefore reviewed, to the effect that the fireman and engineer were in their respective places as the train moved north; that the headlight illuminated the entire track ahead at all times for a distance of 800 feet or more; that he (the fireman) was keeping a continuous lookout ahead on the track and off to the left to see that everything was clear; that he saw

no person in the beam of the headlight or coming up from the left into the beam or at any place where he could see; that both rails of the passenger main at and beyond the Park Avenue crossing and between the crossing and the "pot signal" were illuminated and visible in the beam of the headlight, before the train started; and that he knew of no obstruction to his view or that of the engineer. There was evidence, as stated, that the train moved forward 354 feet from a stopped position to the place where deceased's body was found at a speed of 3–5 miles per hour.

While there was evidence that the engineer was "on the seat box operating the engine", there is no evidence that he was looking or what he saw or didn't see, or that deceased was on the track where he could be seen. There was evidence that from the fireman's seat on the engine, the closest point the fireman could see the left rail was six feet in front of the engine and that it would be about the same for the engineer to see the right rail. There was no evidence concerning the closest point in front of the engine that the fireman could see the right rail, or to the right of the right rail, or for the engineer to see the left rail.

As stated, the fireman's testimony tended to show that the engineer was at his post and had a duty "to maintain a lookout as he proceeded north" from the station under the facts and circumstances hereinbefore set out. From the facts reviewed, appellant infers that the engineer gave no signal or warning or made any slackening of the speed of the train (facts not shown by evidence) and from these inferred facts appellant would further infer that the engineer must have seen no one on or near or approaching the track from the right or east side of the train and, since no one was seen to approach the track from the east side, or from the west side (fireman's side) the deceased must have been on and remained upon the track from the time the train started up from the station. In so contending the appellant would draw infer-

ences from facts which are inferred from other facts. See Hamilton v. Kansas City Southern R. Co., 250 Mo. 714, 723, 157 S.W. 622. We find no testimony in the record from which an inference can be drawn that the engineer saw no one near the track or approaching from the east side of the track as the train moved north.

■ Further, while appellant relies on the testimony of both the fireman and the conductor to establish, as a fact, that the deceased was on the track when the train started and that he remained there in a position of peril and danger, until he was run over and killed, appellant relies chiefly upon the testimony of defendant's fireman, who was a witness for plaintiff. The record does not support appellant's contention concerning the facts testified to by the conductor, so we need only consider the fireman's testimony. From inferences which the appellant seeks to draw from the fireman's testimony appellant contends that the jury could find the facts to be in direct contradiction of the witness' direct testimony. While the fireman testified that he was looking ahead; that he could see the area in question; that the light was sufficient; and that he saw no one on or about the track ahead of the train, still the inferences sought to be drawn from this evidence are insufficient to sustain a finding of facts contrary to the direct testimony of the witness. The rule is that where a plaintiff has relied upon the testimony of one witness to prove an essential element of plaintiff's case, and the witness testifies directly and definitely one way, the plaintiff may not have the jury disregard his only direct evidence as to the essential fact and find the fact is exactly the opposite on the basis of inferences from circumstances also stated in the testimony of the same witness. Draper v. Louisville & N. R. Co., 348 Mo. 886, 156 S.W.2d 626, 633; Rodan v. St. Louis Transit Co., 207 Mo. 392, 105 S. W. 1061, 1066; Reece v. Reed, Mo.Sup., 326 S.W.2d 67.

The presumption of due care and the presumption against suicide, relied upon by appellant, are not relied upon to show the deceased's freedom from contributory negligence, this being a last clear chance negligence case, but to aid plaintiff in making out a case of defendant's negligence. They do not aid appellant's case under the facts shown by the record. They are insufficient to supply the necessary proof that deceased was upon the track a sufficient distance ahead of the train to make a submissible case under the last clear chance doctrine. Darby v. Henwood, 346 Mo. 1204, 145 S.W. 2d 376, 380; Whiteaker v. Mo. Pac. R. Co., Mo.App., 15 S.W.2d 952, 956 (6–9).

Appellant further relies on Whiteaker v. Mo. Pac. R. Co., Mo.App., 28 S.W.2d 680, and Allen v. Chicago R. I. & P. R. Co., 227 Mo.App. 468, 54 S.W.2d 787. In these cases circumstances are presented from which time and place or the when and how of deceased's peril is made to appear. No such facts are shown by this record. Appellant also cites Dickerson v. Terminal R. Ass'n, Mo.Sup., 284 S.W.2d 568, 572, in support of her theory that the "negative testimony" in the record is sufficient to establish the fact that deceased was on the track when the train left the station. By "negative testimony", appellant again refers to the testimony of the fireman and the conductor, but on the theory that they both testified that they were in a position to see and know whether deceased came upon the track after the train started up; that they were looking forward; and that they did not see deceased come on the track ahead of the train. As stated, their testimony was insufficient to support a finding that deceased was on the track at the time stated, or at any sufficient time and distance for the casualty to have been avoided.

■■ From a careful review of the entire record and a full consideration of all theories presented, we must and do hold that there is no substantial evidence in the record from which an inference can be drawn that deceased was on the track when the train started from the station or that he was on the track ahead of the train at a place where he could have been seen and

at a sufficient distance for defendant's servants to have stopped the train and have avoided injuring him. The applicable rule as stated in Hamilton v. Kansas City Southern R. Co., supra, 250 Mo. 714, 722, 157 S.W. 622, 624, applies. The court there said: "In order to bring the case within the theory of the last clear chance doctrine, it is necessary that there should be evidence, positive or inferential, that the deceased was upon the track, lying, standing or sitting for a time prior to the injury sufficiently long for actual or constructive sight by the persons in charge of the train, and when it was at a distance sufficiently great to permit it to be stopped before striking him. There is no evidence whatever in the record from which these facts can be legitimately inferred. And as they cannot rest upon a prior inference that he was killed by the train, arising upon proof of the position of his body and the blood stains on the track, there is nothing in the case by which they can be established." And see Hendrick v. Kurn, 352 Mo. 848, 179 S.W. 2d 717, 720.

The judgment is affirmed.

All concur.